WILLIAM S. NORTHERN v. CHESAPEAKE & GULF FISHERIES COMPANY, Appellant.—8 S. W. (2d) 982.

Division One, July 30, 1928.

1012

*Mertsheimer & O'Donnell, E. M. Tipton* and *Grover & Graves* for appellants.

*Madden, Freeman & Madden* and *H. G. Pope* for respondent.

1018

SEDDON, C.—Plaintiff, who was an employee of the Midwest Fisheries Association, a domestic corporation, commenced this action on November 16, 1923, to recover damages in the sum of $20,000 for alleged personal injuries resulting from a fall into an open and unguarded elevator shaft, situate upon certain premises leased, operated and maintained by Chesapeake & Gulf Fisheries Company, a domestic corporation, and known as No. 1317 Cherry Street, in Kansas City, Missouri. The casualty occurred about eleven o'clock on the morning of October 16, 1923. The action was brought against both of the above-named corporations, but the trial court sustained a demurrer to the evidence on behalf and at the request of the defendant Midwest Fisheries Association, plaintiff's employer, and the cause was submitted to a jury as to the actionable liability of defendant Chesapeake & Gulf Fisheries Company, resulting in a unanimous verdict and a judgment against said last-named corporation in the sum of $16,000, from which judgment said defendant has appealed to this court, after due and timely procedural steps for a new trial.

The substantive allegations of plaintiff's petition are as follows:

"That on or about October 16, 1923, about eleven o'clock A. M. on said day, plaintiff was in the employ of defendants as the driver and operator of a truck used by defendants to deliver goods and transfer fish, oysters and merchandise from one plant of defendants to the other at the above places of business of defendants, and he was also used by defendants to deliver fish, oysters and merchandise from said plants of defendants to points throughout Kansas City, Mis-

souri. That the plant or building of defendants located at said No. 1317 Cherry Street, in Kansas City, Missouri, consisted of three floors and a basement, and on the east or rear side of said building, and inside the east wall thereof, defendants maintained an elevator shaft inside of which was run and operated a power elevator, which was run and operated from said basement to the third floor of said building. That said elevator was operated by electric or other power, and defendants neither provided nor employed any regular operator to operate the same, and the employees of defendants and those who desired to use it entered therein and pulled a cable which started the elevator in motion and it was thus moved from floor to floor in said building. That the elevator was about eight feet by ten feet in width and length, and opened on the east side of said building out onto a narrow dock about two feet in width, and when automobile trucks were backed up against said dock, barrels of fish and other merchandise would be loaded from said elevator at the first floor of said building onto said trucks, and the employees of defendants, including plaintiff, would stand on said narrow dock or floor in doing said work. That said opening into said elevator was at least eight feet across. That across the said opening of said elevator at said first floor of said building on the east side thereof was stationed a safety gate or door which was originally placed so as to be raised and lowered and closed across said opening when said elevator was absent from said opening or floor or dock, but for many months on and prior to said October 16, 1923, defendants through their agents, employees and vice-principals in charge of said elevator had caused said safety gate or door to be kept open or above and held in position or fastened above said elevator opening so that there was no door or safety gate across said opening when said elevator was absent or away from said floor or dock or opening during the daytime when the employees of defendants, including plaintiff, were at work on or at said dock and near said elevator or at work on said elevator at said floor or other floors of said building. That, if said safety gate or door had been used. when said elevator would leave said first floor or dock, and when said safety gate or door was in place across said opening, it would have formed a barrier to a person working on said narrow dock or floor and on said automobile trucks and same would have prevented said employees, including plaintiff, from falling into said elevator shaft if the elevator was absent from said floor or opening out onto said dock or alley.

"On or about said October 16, 1923, about eleven o'clock, A. M. on said day, plaintiff had just finished loading said truck with a number of barrels of fish which he was to transfer from said building to the building of defendants at No. 1656 Washington Street, in Kansas City, Missouri, and he had taken said barrels from said

elevator, which elevator had brought same to said floor or opening from another floor in said building, and said elevator had been run from said floor to another floor of said building and was not then standing at said first floor even with said dock, and plaintiff started along on said narrow dock or floor to place a rope around said barrels and fasten the ends thereof to said truck to keep said barrels from sliding out or off from said truck, or was standing on said narrow dock adjusting the position of the barrels, which was a part of his work or duties, when suddenly his feet slipped out from under him because of the wet, slimy and slick condition of said narrow dock or floor between said truck and said elevator shaft and he was precipitated and thrown with great force and violence into said open and unprotected elevator shaft and down into the basement below, a distance of about eighteen or twenty feet, and onto the concrete floor thereof and onto debris in the bottom of said elevator shaft, whereby he received the following injuries: . . .

"Plaintiff further states that, at all the times herein complained of, there was in full force and effect in Kansas City, Missouri, an ordinance governing the operation and use of elevators in said Kansas City, including the elevator and parts connected therewith in question herein, said ordinance being No. 38919, and by Sections 109 and 114 thereof it was provided as follows: [The aforesaid sections of said ordinance are here pleaded *in haec verba*.]

"Plaintiff further states that plaintiff's injuries and damages were caused by the negligence of defendants, in that they failed to furnish him with a reasonably safe place to work; in that they failed to provide and operate an automatic gate at said time and place on the first floor of said building where said opening of said elevator shaft opened out onto said narrow dock or floor and into said alley at the rear of said building; in that the gates or guard or door that was provided was negligently allowed and permitted by defendants and their agents, servants and vice-principals in charge thereof, to be out of order and negligently fastened or so placed and held in such position that it would not automatically work when said elevator was moved from said floor and opening, and said door or gate or guard was not used as a protection across said opening when said elevator was away from said floor or said opening, when defendants knew, or in the exercise of ordinary care could have known, that such was the situation with reference to the use or non-use of said safety gate or door or guard before and at the time in question; and negligently permitted and acquiesced in the method of permitting the elevator to be moved from the place aforesaid without a gate or barrier closing said entrance and without warning to employees working about said opening, although defendants knew, or in the exercise of ordinary care could have known, of the danger thus

created to said employees, including plaintiff, in time, before plaintiff was injured, to have provided a gate, barrier or method of warning to protect such employees, but negligently failed to do so; in that defendants negligently provided a narrow platform or floor between the opening of said elevator on said floor and the alley or rear of said building and the trucks backed up to said platform or wall or dock when using said elevator, when a wider and more reasonably safe platform or dock or place to stand and work on should have been provided for plaintiff and the other employees of defendants; in that defendants negligently allowed and permitted said dock, floor or platform aforesaid to become coated or covered with slime, water and other slick substances such that it was hard for plaintiff and said other employees of defendants to stand and walk on without their slipping or falling thereon or therefrom in the doing of their work, which compelled them to walk and stand thereon, as defendants knew, or in the exercise of ordinary care could have known, and which dock, floor or platform plaintiff and said other employees habitually used and were instructed to use by defendants and their agents, servants and vice-principals in doing said work, and which they were compelled to use in loading merchandise and other material from said elevator onto said trucks at said place and opening, and when defendants knew, or in the exercise of ordinary care could have known, that when so using said dock, floor or platform there was danger of plaintiff and said other employees falling down said elevator shaft unless said safety gate or door or guard was standing in proper position or closed across said opening into said elevator shaft at said place when the elevator in said shaft was absent from said floor or opening, and that defendants knew, or by ordinary care could have known, that at said time when plaintiff slipped on said dock, floor or platform as aforesaid and was precipitated or thrown down into said shaftway, said automatic gate, door or guard was out of order and position, and had been out of order and position and not used a sufficient length of time prior to said time for defendants to have remedied said defects or omissions to use the same under such circumstances and as well to have remedied and removed the slick, slimy, wet and slippery condition of said dock, floor or platform aforesaid; and in that defendants negligently failed to comply with the terms of said ordinance, above set forth, and negligently failed to have an elevator operator to operate the elevator and safety gate, door or guard in question in violation of the terms of said ordinance and contrary to law.''

The answer of defendant, Chesapeake & Gulf Fisheries Company, denies generally the allegations of the petition; pleads assumption of the risk by plaintiff; and also pleads that the injuries, if any, sustained by plaintiff were caused by the negligence of plaintiff directly

contributing thereto in this: "That on said occasion, the plaintiff, after his truck had been loaded, carelessly and negligently stepped on top of the wall in question, and on the tail or end gate of his said truck, and by reason of his failure to maintain his equilibrium in the place he deliberately placed himself, unnecessarily in the performance of his duties, and in failing to observe the conditions of his surroundings at the time and place in question, which were plainly open, visible and obvious to plaintiff at said time and place. Defendant further states that the acts of plaintiff as alleged herein, and in his petition, were acts of negligence on his part directly contributing to whatever injuries, if any, were sustained by him on said occasion."

The reply is a general denial of the averments of said answer. The evidence tends to show the following facts:

Plaintiff, for about three months prior to October 16, 1923, had been in the employment of the Midwest Fisheries Association as an automobile truck driver, earning a weekly wage of $25. Prior to said employment, he had worked at various garages as an automobile mechanic, having theretofore taken a course of instruction in an "automobile school." After the commencement of his employment as truck driver by the Midwest Fisheries Association, certain of the stockholders and officers of the Chesapeake & Gulf Fisheries Company acquired a controlling interest, through the purchase of a large amount of capital stock, in the Midwest Fisheries Association, and one Graham, a representative of the Chesapeake Company, was put in charge, as manager, of the Midwest Association. Both corporations were engaged in the storage and sale, at wholesale, of fish, oysters, and other sea and lake foods. The Midwest Association had a storage plant at No. 1656 Washington Street, and the Chesapeake Company had a similar plant at No. 1317 Cherry Street, the two plants being approximately a mile or more distant, in Kansas City, Missouri. After Graham took charge, as manager, of the Midwest Association storage plant, and in contemplation of a merger of said two corporations, which was effectuated on or about January 1, 1924, subsequently to the date of plaintiff's alleged injuries, by the organization of a new corporation, under the corporate name of Mid-Central Fish Company, a stock of salt fish, which had been stored in barrels in the storage plant of the Chesapeake Company on Cherry Street, was removed by automobile trucks to the plant of the Midwest Association on Washington Street. The foreman of the Midwest Association plant was one Canote, and the foreman of the Chesapeake Company plant was one Albright. On the early morning of October 16, 1923, plaintiff reported for work at the plant of his employer, Midwest Fisheries Association, on Washington Street, and was ordered by Canote, his foreman, to take a large Mack automobile truck, having a capacity of some thirty-five barrels, or more, of salt fish, to the plant of the

Chesapeake & Gulf Fisheries Company on Cherry Street, and there to report to Albright, foreman of the Chesapeake Company, for further orders. Pursuant to the orders of his foreman, Canote, plaintiff proceeded with the large automobile truck to the plant of the Chesapeake Company, and, upon his arrival there, he reported to Albright, foreman of the latter corporation, for instructions as to his work. Plaintiff was directed by Albright to take another and smaller truck of the Chesapeake Company, and to make a delivery of fish to a nearby railway station. Returning from that trip with the smaller truck, plaintiff was then directed by Albright to finish the loading of the large truck, which meanwhile had been backed to a loading dock in the rear of the building used and maintained by the Chesapeake Company at No. 1317 Cherry Street.

The building of the Chesapeake Company was three stories in height above the street level, with a basement below the street or alleyway level of the building. The front of the building faced west on Cherry Street, and the building extended easterly for the distance of a half city block, the rear end thereof abutting upon an alleyway. Apparently, trucks and wagons were loaded, or unloaded, as the case might be, from both the front and rear ends of the building. Plaintiff testified that he had made several trips, prior to the date of his alleged injuries, to the Chesapeake Company plant, but on each of such trips he had loaded, or unloaded, the truck in front of the building on Cherry Street. He testified that, until the morning of the casualty in question, he never had had occasion to load a truck at the rear, or alleyway, end of the building. Photographs of the rear, or alleyway, end of the building are in evidence, and those photographs, as well as the oral testimony of witnesses familiar with the premises, disclose that there is a freight elevator shaft at, or near, the south side of the alleyway end of the building, located approximately in the southeast corner of the building. The elevator shaft is approximately ten or twelve feet wide from north to south, and perhaps slightly wider from east to west. The elevator shaft extends from the basement to the top, or third, floor of the building. Immediately east of the elevator shaft, and lying between the elevator shaft and the alleyway, is a narrow concrete ledge, some twelve to sixteen inches in width, which was used as a loading dock by the Chesapeake Company. The top of the ledge, or loading dock, is about four feet above the level of the alleyway, and is on a plane with the first floor of the building. Two openings, or doorways, lead into the elevator shaft on the first floor of the building, one on the east, or alleyway, side, and the other on the west side of the shaft, leading directly from the first floor of the building. In other words, when the floor or platform of the elevator is stopped on a level with the first floor of the building, there is a continuous passageway, over

1024

the platform of the elevator, from the first floor of the building onto the narrow ledge, or loading dock, at the rear, or alleyway, end of the building. The level of the loading dock and the east elevator door-way is about the level of the floor of an automobile truck, when backed up to the loading dock on the alleyway end of the building. There is another entrance, or doorway, leading to the rear of the first floor from the alleyway, located slightly north of the elevator shaft and entrance, but apparently there is no ledge or loading dock immediately adjacent to such north rear entrance. The west, or inside, door-way to the elevator shaft was guarded by an automatic gate or guard, which closed automatically when the platform of the elevator was elevated or lowered from the first floor level of the building. The east, or alleyway, doorway to the elevator shaft was not guarded by an automatic gate, nor was there a guard or protection of any kind, except a sliding wooden door, which one Carr, the president of the Chesapeake Company, describes as a fire door, suspended on weights, so that it could be raised or lowered manually. It seemingly was customary to keep the alleyway sliding door open, or raised, during the daytime, except only when the weather was inclement, cold or windy. Witness Carr testified, respecting such door: "It was customary for that door to be up all the time when the weather permitted, during the daytime;" and appellant's foreman, Albright, testified: "Well, sometimes it is open practically all day and sometimes it ain't; whoever goes out shuts it or not; it is never supposed to be open, but in the summer time we would sometimes leave it open all day. Q. Well, how about October 16, 1923? A. Well probably, yes; we would generally leave it open all day. Q. Now, when the elevator left the first floor, you had no habit of closing that door when the elevator leaves that floor, did you? A. No, sir. Q. And that was the custom in October, 1923? A. Yes, sir. Q. And had been for a long time prior thereto? A. Yes, sir. Q. As long, as you have been there? A. Yes, sir." According to the testimony of appellant's president, Carr, "you had to get on the elevator in order to operate the door there. That was merely a door—not a gate Q. It was not intended as an elevator gate? A. No, sir. Q. But just a door to close the opening? A. Yes. Q. You closed it at night, and in cold weather, but at all other times you left that door open? A. That was optional with the men. If the wind happened to be blowing, then they would close it, but ordinarily in warm weather the door would be open. Q. You never used it as a protection from the elevator well from the outside? A. Absolutely not."

The freight elevator was operated by electrical power, and the power was controlled by a cable, running through the top and the floor of the elevator, which cable, according to Carr's testimony, was

operated by pulling thereon "on the inside of the building, or on the elevator itself." The evidence tends to show that the elevator was practically noiseless in its operation, but that a bell was provided, which bell the employees of the Chesapeake Company were instructed to ring or sound whenever the elevator was moved or started from a stationary position, apparently as a warning or signal of its movement. No regular operator of the elevator was employed by appellant, but the elevator apparently was operated indifferently by the several employees of appellant whenever the use of the elevator was necessary or required. Most, if not all, of the stock of salt fish was stored in barrels upon the second floor of appellant's building, and, in removing the barrels of salt fish from the building, it was customary to load the barrels of fish upon the elevator at the second floor of the building, bring them down on the elevator to the first floor of the building, and then roll the barrels upon their ends or rims from the elevator platform across the narrow ledge, or loading dock, on the east side of, and adjacent to, the elevator shaft, and thence upon the floor of the automobile trucks, which were backed in the alleyway against the edge of the loading dock. The salt fish was packed in brine in the barrels, each barrel weighing approximately 300 pounds, and in removing the barrels of fish across and over the narrow ledge, or loading dock, the ledge unavoidably and necessarily became slick, slippery, and slimy from the brine which leaked from the barrels, and the end gates of the automobile trucks likewise became slick, slimy, and slippery therefrom. Such was the condition of the narrow ledge, or loading dock, and the end gate of the automobile truck used by plaintiff on the morning of the casualty in question, according to plaintiff's evidence.

The evidence tends to show that, when plaintiff returned to the Chesapeake Company's building after having made the delivery to the railway station in the smaller truck, the large Mack truck had been almost loaded by the employees of the Chesapeake Company. A few barrels of salt fish, some five or six, remained on the elevator to be loaded upon the truck when plaintiff returned, and he was ordered by appellant's foreman, Albright, to complete the loading of the large truck. What occurred thereafter is best told by the testimony of plaintiff, as follows: "We finished taking the barrels off the elevator and loaded them on the truck, down to the last three barrels. Then I dropped the truck down far enough that I could let the tail gate down and put three barrels on the tail gate. After I got the three barrels on the tail gate. I went around the truck and throwed the rope up over it, and just as I throwed the rope up over it, why, Neal, the fellow that was helping load the truck, told me to get the bills on that load, that I had to have bills on, and I went up and got the bills and came back on the north side of the truck and

started to pull up the rope, and the rope was fast. I got up there to loose the rope and there was a barrel that wasn't placed just right and I started to place the barrel around, and while I was doing that, my foot slipped from under me and I fell. . . . As clear as I can recall it, when I was up there placing those barrels and starting to put the rope around it and tie it down, when my foot slipped out from under me and I fell backwards and that is the last I remember anything about. I could tell that I was falling and I couldn't get it into my head what was happening to me, either; but I remember I had a sensation that seemed like I was falling, and that is the last I can remember. Q. Before you fell, how were you standing? Were you standing on the end gate, or on the dock, or how were you standing? Just tell us as near as you can recall it. A. As near as I can recall it, I was standing on both. Q. How do you mean by that? A. I had one foot on the dock, and one on the tail gate. Q. And what were you doing just as you slipped? A. The trouble was that there were two barrels too close together, and I was trying to get this center barrel pushed down in between the two, so when I put the rope down the barrel wouldn't let the rope slacken and fall down to the bottom of the barrel. Q. And that is what you were doing when you fell? A. Yes, sir. Q. How about the elevator—when did you see the elevator platform there? A. I saw the elevator when they brought it down there. The last I remember seeing of it was when I turned around—when I had taken that last barrel off and turned around to start to placing them. Q. When you were adjusting those barrels on the load, which way were you facing? A. Facing east. Q. That is towards or away from the elevator? A. Away from it. Q. Your back towards the elevator? A. Yes, sir. Q. When had you seen the elevator platform before that? When had you last seen it? A. It was before I turned around and started to work on the barrels. Q. Did you know that the elevator had been moved? A. No, sir. Q. Did you hear any signal, any bell, or any call, or hear any movement about the moving elevator before you slipped? A. No, sir. Q. Did you hear any gate shut, or any movement of any door, or anything like that? A. No, sir, I didn't. . . . Q. You went in and got your bills, and then what did you do? A. I came back. Q. What did you do when you got back out? A. That is when I started to place those barrels. Q. Do you know how you came out? A. I wouldn't say positively which way I came out. Q. You don't know whether you crossed the elevator, or came out the other way? A. No. Q. The elevator was in place there at that time, wasn't it? A. I presume it was. Q. Don't you know whether it was in place when— A. It was in place when I was working on it back there. Q. Was it in place when you came back with your bills? A. I presume it was. Q. It was in place when you went

in for your bills, wasn't it? A. Yes, sir. Q. And you don't recall whether you came out with your bills and crossed the elevator, or whether you came out this door immediately to the north of the elevator? A. No, sir.''

Witness Neal, who was also an employee of the Midwest Association, testified on behalf of appellant: "I came up to get a load of salt fish, stopped at the alley south of the building, and Mr. Northern (plaintiff) was back in there with his truck partly loaded. I got up on the truck and helped him finish loading off the elevator. Then I got down on the ground. The elevator went up to get a load for me. Q. When did the elevator go up to get a load for you? A. Just as soon as I finished loading Mr. Northern's truck. Q. Did Northern go inside the building? A. He did. Q. And do you recall how he went inside the building? A. He stepped up to the door off his truck, to the door north of the elevator and went back. Q. Did the elevator leave that particular floor where you were loading at the time Northern left? A. It left the floor as soon as we finished loading Northern. Q. And had it left the floor before Northern went inside the building? A. Yes, sir. Q. Where were you, Mr. Neal, when Northern came back? A. Standing at the north side of his truck, on the ground. Q. And where did Northern come from? A. He came back through the same door he went in at. Q. Is that the door immediately north of the elevator door there? A. Yes, sir. . . . He stopped there in the door and took a cigarette out of his pocket and put it in his mouth and lit the cigarette with a match. Then he stepped over on this truck out of this door, onto the tail gate of the truck. He stepped over somewhere near the center of the truck—the tail gate. He had one foot on the tail gate and one foot on the ledge there, reaching over after something—I suppose it was a rope to tie the load on. He might have took a step or two over, because he went over more to the center of the tail gate and then reached after the rope. His right foot slipped off the wall and he fell over backwards. Q. And while you were standing there did you see the elevator come down again? A. No, sir. Q. Was it there at the time he stepped on the ledge? A. No, sir. Q. And you are sure that the elevator had gone up before Northern went into the building? A. Yes, sir. Q. And it was not back in place at the time he came out? A. No, sir. . . . Q. Now, as I understood you, this truck was backed in here and it was right up to the dock, wasn't it? A. Yes, sir. Q. And the end gate extended over some distance, and he stepped from the end gate right up to this open doorway (indicating)? A. Yes, sir. Q. Then he came back, he retraced his steps and stepped down on the end gate, or on the ledge? A. Yes. He stepped out of the north door onto the end gate. Q. And that was about on a level with the dock there, wasn't it? A.

Just about. Q. And .he bent over here with his back toward the elevator? A. Yes, sir. Q. And he went to adjusting something about the rope, you assume? A. Reached over; yes, sir. Q. And he had his left foot on the end gate? A. Yes, sir. Q. And his right foot down on the ledge? A. Yes, sir. Q. And just as he reached, his foot slipped, and he went over backwards into the elevator shaft? A. That is it. Q. And that shaft was something like twelve or fifteen feet deep? A. I should judge it would be twelve or fifteen feet, something like that. Q. And down in the bottom of the shaft was a concrete floor? A. I think so.''

Plaintiff pleaded in his petition, and put in evidence on the trial, two sections of the general building code ordinance of Kansas City, in force long prior to, and at the time of, the casualty, which provides: ''In any building in which there exists any hoistway or freight elevator or well hole not inclosed in walls constructed of brick or other fire-proof material and provided with fire-doors, the openings thereof through and upon each floor of said buildings shall be provided with and protected by a substantial guard or gate . . . The guards or gates and railings shall be of such material and form of construction as may be approved by the superintendent of buildings. Such guards or gates shall be kept closed at all times, except when in actual use. . . . A perpendicular automatic gate where a freight elevator is used shall be placed on each floor at which any hatch or opening may be. Such gates shall be kept closed at all times except during the passage of the elevator, and the car or cab platform of such elevator shall during the nighttime remain at the bottom of the elevator shaft.''

Plaintiff's evidence tends to .show that plaintiff was rendered unconscious by the fall of twelve to fifteen feet into the basement, or concrete bottom of the elevator shaft; that he was removed, about noon, in an unconscious condition, to a hospital, where he did not regain consciousness until late in the evening of his injury, some nine hours thereafter; that he was bleeding from the back of the head and from the left ear, and suffered pain in the back, hips, neck and head; that he had severe contusions of the side, back and upper abdomen; that his head was kept in ice packs for about a week, his body was bandaged, and an electric pad was applied to his back; that, at times, he was delirious and irrational, and he suffered almost continuous pain; for the first day or two, his urine was voided by means of a catheter, indicating that plaintiff was in a state of extreme nervous shock; that hypodermics were administered to relieve his suffering; that the bleeding from the left ear continued intermittently for approximately one week, and that he frequently vomited blood from the stomach; that he remained in the hospital for about twelve days, where he was visited by a physician at least once, and

sometimes thrice, daily; that, after being removed to his home, he received treatment from physicians for from three to five months; for several weeks he could walk only with the aid of a cane, which he finally discarded, but at the time of the trial he walked with a perceptible limp; that he was twenty-six years of age at the time of his injury, and, prior to his injury, he had been a strong, active, vigorous and robust man, engaged in heavy, manual labor requiring strength and activity, and that he had previously suffered from no serious mental or bodily illness or affliction, but since his injury he has been unable to perform any arduous work, or to engage in any employment which paid him a wage commensurate with that which he had earned previously; and that he is handicapped in obtaining employment of any kind, because of his forgetfulness and loss of memory. The evidence discloses that he worked on a milk truck, delivering bottled milk, for short intervals prior to the trial, but that he merely assisted the driver of the truck in making deliveries, and did not himself operate the automobile truck.

Medical witnesses testified on plaintiff's behalf that he suffers from opthalmoplegia, or paralysis of the muscles of the eye; that he frequently suffers with migraine, or sick headaches, accompanied by nausea; that he is afflicted with double vision, which causes him to see two objects instead of one, thereby making it unsafe and practically impossible for plaintiff to drive an automobile or any moving vehicle; that the rotary movement of the eyeballs is affected, and consequently the eyes are incapable of normal convergence; that his memory is faulty and uncertain, and his mental processes are slow and sluggish; that he shows evidences of extreme nervousness and irritability; that the ocular nerves are affected, the eyes are congested and the pupils dilated, resulting in an apparent glassiness or stare of the eyes; that he suffers pain over the sacro-sciatic or sacro-lumbar region of the back and over the left hip, producing a sacro-sciatic involvement in the nature of a permanent neuritis; that the semi-circular canal of the left ear, which controls the sense or power of equilibrium, was injured, resulting in inability to maintain his equilibrium and in a lack of precision in his movements; that the sacro-sciatic nerve sheath has been injured, producing constant pain and a tendency to limp on the left leg, thereby preventing the performance of work which involves stooping, bending or lifting; that such mental and physical symptoms and conditions are indicative of a fracture of the skull and a severe concussion of the brain, with resultant mental and muscular incoordination and loss of memory; and that the aforesaid physical and mental conditions, as found by said medical witnesses, are permanent, and could have resulted from plaintiff's fall into the elevator shaft.

No X-ray photographs were offered in evidence by plaintiff, but appellant offered several such photographs in evidence, which appellant's medical witnesses testified showed no fractures of plaintiff's skull, or of any of the bones of his body. Appellant's medical witnesses, by their testimony, greatly discounted the nature and extent of plaintiff's injuries, claiming that objective and subjective examinations made of plaintiff by them indicated that plaintiff had suffered no serious or permanent injury; that they found no evidence of fracture of any kind, no loss of the sense of equilibrium, no injury to the muscles or nerve structure of the eyes, no sign or symptom of double vision, and that plaintiff's eyesight is normal and one hundred per cent perfect, and that his answers to questions propounded by said physicians were very intelligent, and indicated no loss or lapse of memory. In other words, to sum up the conclusions and findings of one of appellant's medical witnesses, he testified: "I don't think there is any permanency in any way whatsoever traceable to this accident. Q. What do you think his physical condition is, from every standpoint? A. Excellent."

At the conclusion of all the evidence, the defendant-appellant requested the trial court to give a peremptory instruction, in the nature of a demurrer to the evidence, directing a verdict for defendant, which peremptory instruction was refused by the court. The cause was submitted to the jury upon an instruction, requested by plaintiff and given by the trial court, submitting the single issue, or specification, of negligence upon defendant's part in failing to provide a reasonably sufficient gate or guard to prevent persons who were using the concrete ledge, or loading dock, from falling into the elevator shaft.

I. Appellant assigns error in the refusal of its peremptory instruction, in the nature of a demurrer to the evidence, requested at the close of all the evidence, for the following reasons: (1) While plaintiff, in his petition, pleaded several grounds or specifications of negligence, his case was submitted to the jury only upon the single ground that defendant failed to provide a reasonably sufficient gate or guard to prevent persons from falling into the elevator shaft, and, inasmuch as the evidence shows that defendant did provide and maintain a sliding door on the east side of the elevator shaft, thereby making it unnecessary to have any other gate or guard on that side of the elevator shaft, the single ground or specification of negligence aforesaid should not have been submitted to the jury; (2) the failure of defendant to provide and maintain a gate or guard at the east side of the elevator shaft was not the proximate cause of plaintiff's injury, for the reason that the evidence discloses that plaintiff's fall was directly and primarily occasioned by the slick, slippery and

slimy substance upon the end gate of the truck and upon the loading ledge or dock, thereby causing plaintiff's feet to slip from under him, which condition was open, obvious and fully known to plaintiff prior to his fall; (3) the evidence fails to show who moved the elevator from the first floor of the building, i. e., whether the person who moved the elevator was a fellow-servant of plaintiff, a mere stranger, or a vice-principal of defendant, and therefore the jury were left to speculate and guess whether the elevator was moved by a fellow-servant of plaintiff or a stranger, for the acts of either of which persons defendant is not legally liable, or whether the elevator was moved by a vice-principal of defendant, for whose acts defendant is responsible; and (4) plaintiff was guilty of contributory negligence as a matter of law, barring a recovery for his injuries, because (a) plaintiff did not move the automobile truck a sufficient distance away from the loading ledge so that he would not have stood, or worked, upon the slippery and slimy ledge, or loading dock, thereby adopting a dangerous method of loading the truck when he might have adopted an available safe method; (b) plaintiff took a dangerous position upon the ledge and the end gate of the truck, well knowing the slippery and slimy condition of the same, without looking to see whether the elevator platform was level with the ledge or not; and (c) defendant had provided a sliding door at the east side of the elevator shaft, which door could and should have been pulled down by plaintiff, thereby closing the opening into the elevator shaft and preventing his falling therein. We will discuss and rule the foregoing contentions of appellant in their order.

(1) It is contended by appellant that plaintiff submitted his case upon the single theory that defendant had negligently violated its common-law duty to provide and maintain a reasonably sufficient gate or guard on the east side, or opening, of the elevator shaft, whereas the evidence shows without contradiction that defendant did provide a sliding door, which could have been pulled down, thereby guarding and closing the east opening into the elevator shaft. While it is true that the evidence discloses that defendant provided and maintained a sliding door at the east opening of the elevator shaft, nevertheless, the evidence also discloses without question, and by the admissions and testimony of appellant's president and its foreman, that such sliding door was habitually and customarily kept open in the daytime, except in inclement, cold or windy weather, and that said door was ordinarily kept closed only during the nighttime; that its main, if not sole, use and purpose was to serve as a fire door, and that, to use the expression of appellant's president, Carr, it was "absolutely not used as a protection from the elevator well from the outside" of the building, or the loading dock, and was not intended as an elevator gate.

In Wendler v. People's House Furnishing Co., 165 Mo. 527, 534, 541, plaintiff, who fell into an unguarded elevator shaft and was injured thereby, submitted his case upon the theory that defendant was negligent in failing to use ordinary care to see that the room was sufficiently lighted and to keep the elevator shaft opening sufficiently guarded, and that, in consequence of insufficient light and the absence of a guard, plaintiff, while exercising ordinary care, fell into the opening of the elevator shaft and was injured, thereby entitling him to recover damages for his injury. Plaintiff had a judgment in the trial court, and, in affirming the judgment below, this court, en banc, said: "There was a gate to guard this opening but the testimony on both sides showed that, by order of the man in charge of the room, the gate was usually left open, or pushed up out of the way, leaving the opening unguarded, and it was so on this occasion. . . . *The evidence showed that the gate was kept open*, not accidentally or occasionally, but *habitually* and by order of defendant's man in charge. *Under that condition it was the same in effect as if there had been no gate.*" (Italics ours.)

Assuming, in the present case, that the maintenance of the sliding door (had such door been intended and customarily used by appellant as a guard to the east opening of the elevator shaft) would have been a full compliance with, and a discharge of, appellant's common-law duty, we think that the uncontradicted evidence of the habitual non-use of the door for such purpose forecloses appellant from contending that it thereby discharged its common-law duty in reasonably guarding the opening into the elevator shaft.

(2) It is insisted by appellant that the failure to provide and maintain a gate or guard at the east opening of the elevator shaft was not the proximate cause of plaintiff's injury, but that the slick, slimy and slippery condition of the end gate of the truck  and of the loading ledge (a condition which seemingly was unavoidable and for which appellant, maybe, was not legally liable) was the direct, immediate and proximate cause of plaintiff's fall and injury, and that he would have fallen, and nevertheless might have been injured, even though the elevator platform, or a guard or gate to the opening of the shaft, had been in place at the level of the loading ledge at the time he slipped and fell.

The rule as to when the cause of the injury is proximate is thus clearly stated in 29 Cyc. 491: "It is sufficient if it be the efficient cause which set in motion the chain of circumstances leading up to the injury, and which in natural, continuous sequence, unbroken by any new and independent cause, produced the injury. The primary cause will be the proximate cause where it is so linked and bound to the succeeding events that all create or become a con-

tinuous whole, the one so operating on the others as to make the injury the result of the primary cause."

In McClosky v. Investment Co., 317 Mo. 1156, 1. c. 1176, 298 S. W. 226, 1. c. 235, this division of this court said, authoritatively quoting Shearman and Redfield on Negligence, sec. 10: "Negligence may, however, be the proximate cause of an injury of which it is not the sole or immediate cause. If the defendant's negligence concurred with some other event (other than the plaintiff's fault) to produce the plaintiff's injury, so that it clearly appears that but for such negligence the injury would not have happened, and both circumstances are closely connected with the injury in the order of events, the defendant is responsible, even though his negligent act was not the nearest cause in the order of time."

A like contention was discussed and ruled in Musick v. Packing Co., 58 Mo. App. 322, 333, wherein plaintiff slipped upon the wet and slippery floor of an ice manufactory and fell into an unguarded and uncovered tank of hot water, the rim of which tank was level with the floor, and which tank was used for the purpose of loosening blocks of ice from metal containers when immersed in the tank of hot water. SMITH, P. J., speaking for the Kansas' City Court of Appeals, in adversely ruling defendant's contention that the unguarded tank was not the proximate cause of plaintiff's injury, therein said: "It is true that if the plaintiff had not slipped his limb would not have been plunged into the hot water tank. It is equally true that, though he slipped, the disaster would not have overtaken him had not the tank been uncovered. The slipping was not the sole cause of the injury. The latter would not have occurred except for the presence and coexistence of both causes. The cause of the plaintiff's slipping was altogether accidental. If it was the sole cause of the injury the defendant is not liable. But the injury would not have resulted had not another cause combined with the accidental cause. If the plaintiff was in the exercise of ordinary care and prudence at the time he slipped and the injury is attributable to the absence of the cover over the tank together with the slipping, then plaintiff should recover. If the direct and proximate cause of the injury was the uncovered and unprotected condition of the tank, then plaintiff would be entitled to recover though the slipping of the plaintiff contributed to the injury. (Citing cases.)"

Likewise, this court has said, in Harrison v. Electric Light Co., 195 Mo. 606, 625: "If a defendant is negligent and his negligence combines with that of another, or with any other independent, intervening cause, he is liable although his negligence was not the sole negligence or the sole proximate cause, and although his negligence without such other independent, intervening cause would not have produced the injury."

: To like effect are the rulings announced in Buckner v. Horse & Mule Co., 221 Mo. 700; Brueggemann v. Ice Co., 171 Mo. App. 59; Walter v. Cement Co. (Mo. Sup.), 250 S. W. 587; Fishell v. American Press (Mo. App.), 253 S. W. 508; Hogan v. Fleming (Mo. Sup.), 297 S. W. 404; Grott v. Shoe Co. (Mo. Sup.), 2 S. W. (2d) 785.

Furthermore, while the determination of the question of proximate cause may sometimes be one of law for the determination of the court, ordinarily it is one of fact for the consideration and finding of the jury. [Laughlin v. Railway Co., 275 Mo. 459, 465; Kidd v. Railway Co., 310 Mo. 1, 28; Johnson v. Construction Co., 188 Mo. App. 105, 121; Gilman v. Fleming (Mo. App.), 265 S. W. 104, 106; Hogan v. Fleming (Mo. Sup.), 297 S. W. 404, 409.]

(3) It is urged by appellant that the burden rested upon plaintiff to establish by the weight of the evidence the fact that the elevator was not moved from the level of the loading dock by a fellow-servant of plaintiff, or by a mere stranger, for whose acts, however negligent they may be, appellant is not actionably liable, and, there being no evidence herein identifying the person who moved the elevator, that the jury were left to guess and conjecture whether the elevator was moved by a fellow-servant of plaintiff, by an outsider and stranger, or by a vice-principal of appellant. In support of such contention, appellant relies chiefly upon the ruling of this division of this court in Purcell v. Shoe Co., 187 Mo. 276, 287, which case involved the relation of master and servant, and wherein one of the specifications or charges of negligence made by plaintiff was that "the defendant permitted any one in the building to run the elevator, and without any warning it was moved." This court found and ruled, in said case, that there was no evidence whatever in the record that defendant permitted anyone in the building indifferently to run the elevator, but, on the contrary, that there was substantial evidence that there was a stockman on each floor whose duty it was to run the elevator, and we there said: "There is no evidence to show who started the elevator on this occasion. No one was on it. If it was started without warning, by the master or a vice-principal, the master would be liable; but otherwise, if it was started by a fellow-servant of the plaintiff. The burden of the proof was on the plaintiff to make out a case against the master, by showing that the accident was from a cause for which the master was liable. The court or jury would have no right to conjecture or guess that the accident occurred from a cause for which the master was liable, and neither would it be proper or right to guess that it arose from a cause for which the master was not liable. The law requires the facts to be proved by the party upon which the burden of proof rests."

We have no criticism to make of the ruling, or of the principle of law announced by this court, in the aforecited case, when applied to the specific negligence charged in that case, and in further view of the nature of the evidence therein and that the case was one involving the relation of master and servant. But whatever may have been the original theory of the plaintiff at the commencement of the instant action, the evidence herein shows quite conclusively, we think, that plaintiff was not an employee of the appellant corporation, Chesapeake & Gulf Fisheries Company, but that he was an employee of another, different and separate corporation, Midwest Fisheries Association, and that the relation of master and servant did not exist as between plaintiff and the appellant corporation. On the contrary, the evidence tends strongly, if not conclusively, to show that plaintiff was an invitee, or licensee, upon the premises of appellant, under some business arrangement between appellant and plaintiff's employer whereby plaintiff was engaged in the removal of barrels of fish from appellant's premises to the premises of his own employer. Clearly, such was appellant's theory on the trial of the case, regardless of what may have been plaintiff's theory, for we find an instruction, D-14, given by the court at the request of defendant-appellant, which told the jury that ''so far as defendant, Chesapeake & Gulf Fisheries Company, is concerned, the Midwest Fisheries Association, and its employees, including *plaintiff, was an invitee* and had a right to be on the premises of defendant, Chesapeake & Gulf Fisheries Company, and had the right to do and perform everything proper and necessary to load and transport said fish.'' (Italics ours.) It therefore matters not, in our judgment, what particular and identical employee of the appellant moved the elevator, for such employee was in no legal sense a fellow-servant of plaintiff, who was not an employee of appellant, but who was the servant of another and different master. Consequently, it was not incumbent upon plaintiff to show what particular and identical person moved the elevator, because the relation of master and servant did not exist as between plaintiff and appellant, and hence the fellow-servant doctrine is inapplicable to the instant case.

But there is another sufficient reason why we believe the foregoing contention of appellant is not well grounded, namely: the petition herein does not charge defendant with actionable negligence in the movement or operation of the elevator, nor was the cause submitted to the jury on any such issue or specification of negligence. In other words, the averments of the petition respecting the moving of the elevator constitute a statement of a mere matter of inducement, or of an existing and attendant circumstance or condition in defendant's building which created a dangerous situation, thereby imposing upon defendant the duty of providing and maintaining a reasonably

1036

sufficient gate or guard at the elevator opening; that is to say, under plaintiff's theory in the submission of his case, the proximate, immediate and direct cause of his injury was the negligent failure of defendant to provide and maintain a reasonably sufficient guard or gate at the east opening of the elevator shaft, and not the moving of the elevator platform, which was only a contributing cause of his injury, due to the fact that no guard or gate had been provided by defendant to prevent or protect an invitee, such as plaintiff, from falling into the open and unguarded elevator shaft. Hence, the instant case is clearly distinguishable from the Purcell case, supra, and does not fall within the principles of law announced and applied therein.

(4) Appellant urges that plaintiff was guilty of contributory negligence, as a matter of law, for the reason that plaintiff voluntarily adopted a dangerous method of adjusting the barrels upon the end gate of the truck, and of tying the rope around the barrels in order to hold the barrels on the truck, in that he stood upon the slippery and slimy ledge, or loading dock, when he might have adopted an available and entirely safe method by moving the truck away from the loading dock and out into the alleyway in order to accomplish his purpose; that he knew the elevator platform was likely to be moved at any time, and although having such knowledge, he voluntarily stood upon the slippery and slimy loading dock, well knowing its slick and slippery condition, without looking to see whether the elevator platform was on a level with the loading dock, and without taking the precaution to pull down and close the sliding door in front of the elevator opening.

The evidence herein tends to show that it was customary and usual for the automobile trucks to be backed against the edge of the loading ledge in loading them from the elevator; that each of the barrels of salt fish weighed approximately 300 pounds, so that it was practical to load and adjust such heavy barrels upon the automobile trucks, the floors of which were some four feet, or more, above the level of the alleyway, only by reason of the leverage to be had from standing upon the loading ledge; that plaintiff had never loaded or unloaded a truck at the alleyway end of the building before the morning of the casualty, having theretofore always loaded his truck at the front end of the building on Cherry Street, from which we think the inference reasonably may be drawn that he was unfamiliar, to some extent, at least, with the existing condition and dangers of the premises at the rear, or alleyway, end of the building, and with the method or manner of moving the elevator platform; that, when he loaded the last barrel upon the end gate of the truck, the elevator platform was then on a level with the loading ledge; that he heard no movement of the elevator, no bell, no call, or other signal or warn-

ing of its movement; that his back was toward the elevator opening when adjusting the barrels upon the end gate of the truck, and his vision was to the east and away from the elevator; and that, in order to close the sliding door, according to the testimony of appellant's president, it would have been necessary for plaintiff to have stood upon the elevator platform, inside of the building, thereby shutting himself off from access to, and use of, the loading dock. As we view the evidence herein, the existing situation and surroundings were not so glaringly, obviously and imminently dangerous as to apprise and warn a reasonably prudent man, in the exercise of ordinary care for his own safety, of the danger of standing or working upon the loading ledge. Hence, we think that the question of plaintiff's contributory negligence was one of fact for the determination of the jury, and that plaintiff cannot be held to have been contributorily negligent as a matter of law. [Unrein v. Hide Co., 295 Mo. 353, l. c. 366 et seq.; Wendler v. House Furnishing Co., 165 Mo. 527, l. c. 537; McCloskey v. Investment Co. (Mo. Sup.), 298 S. W. 226, l. c. 235 et seq.]

We have given careful study and analysis to the several decisions cited by appellant in support of its several contentions, chief among which are Purcell v. Shoe Co., 187 Mo. 276; State ex rel. v. Trimble (Mo. Sup.), 279 S. W. 60; and Hake v. Stove & Range Co. (Mo. App.), 234 S. W. 1061. In the Purcell case, the evidence disclosed that defendant had provided and maintained a reasonably sufficient railing and gate to guard the elevator shaft opening, and this court specifically found that there was no evidence that defendant permitted the gate to habitually remain open, and also found from the evidence that plaintiff knew all about the gates, the manner of running the elevator, and of its construction, at and prior to the time of his injury. In the case of State ex rel. v. Trimble, the evidence disclosed that the injured invitee had frequently used the elevator doorway prior to the day of his injury and was familiar therewith; that a swinging door was provided and maintained across the elevator opening; and that the injured invitee deliberately opened the swinging door and, in broad daylight, stepped through the guarded doorway and into the elevator shaft without looking to see whether the elevator platform was on a level with the doorway. In the Hake case, the court found that the elevator shaft was protected by a sufficient gate or guard, and that such gate or guard was not habitually open by defendant's order, or by order of any one in charge of that part of its premises, but that the gate had been left open for only a brief interval before the casualty by some unknown person who entered the elevator and removed it from that floor. The cases cited and relied upon by appellant are readily distinguishable from the case at bar upon the facts and circumstances in evidence.

In 29 Cyc. 453, 465, 469, it is said by the textwriter: "The owner or occupant of premises who induces others to come upon it by invitation, express or implied, owes to them the duty of using **Invitee** reasonable or ordinary care to keep the premises in a safe and suitable condition, so that they will not be unnecessarily or unreasonably exposed to danger. And hence such persons may recover for injuries received owing to the dangerous condition of the premises known to him and not to them. . . . The rule in regard to the condition and use of lands and buildings is that so long as the owner violates no duty which he owes to others, he cannot be called in question for the manner in which he uses or manages them. . . . Where, however, an owner has reason to apprehend danger from the peculiar situation of his property, and its openness to accident, the question of duty then becomes one for the jury. In cases where a duty exists the owner of property is in general required to exercise ordinary care to keep it in a safe condition. . . . The duty which the law imposes on owners to maintain their premises in a reasonably safe condition for the use of those who may be lawfully there renders the owner liable for injuries caused by . . . unguarded elevator shafts, or trap-doors; and unguarded or defective platforms or passageways."

It is also said in 20 Ruling Case Law 55, 56: "The authorities are entirely agreed upon the proposition that an owner or occupant of lands or buildings who directly or by implication invites or induces others to go thereon or therein owes to such persons a duty to have his premises in a reasonably safe condition and to give warning of latent or concealed perils. In the language of a recent opinion: 'The law is well settled that an owner or occupant of land who by invitation, express or implied, induces or leads others to go upon premises for any lawful purpose is liable for injuries occasioned by the unsafe condition of the land or its approaches, if such condition was known to him and not to them.' [Citing Calvert v. Electric Light Co., 231 Ill. 290, 83 N. E. 184.] If there are hidden dangers upon the premises he must use ordinary care to give warning thereof. While the rule has been applied in innumerable situations, it has been invoked most frequently, perhaps, in the case of injuries from unguarded excavations, unprotected stairways, hatchways and trap-doors. The facts of the particular case are, of course, controlling upon the question of negligence, and the decision thereon is properly within the sphere of the jury."

However, as is stated by many of the juristic authorities, it is well-nigh impossible and impracticable to undertake to lay down a general and inexorable rule of duty, or of actionable liability, upon the subject, inasmuch as each individual case must depend upon its own special circumstances and conditions; therefore, we refrain from

announcing herein any general or inexorable rule of duty or legal liability on the subject. But, in view of the fact that the evidence herein, and the reasonable inferences to be drawn therefrom, tend strongly to show that a dangerous condition or situation (by reason of the slippery loading dock, the absence of a gate or guard in front of the elevator opening, and·the removal of the elevator platform at irregular times and indifferently by defendant's employees) existed upon defendant's premises, and that defendant, on the one hand, knew, or should have known, of the existence of such dangerous condition or situation, and also that plaintiff, on the other hand, did not know· thereof, and was not warned by defendant thereof, we are, therefore, of opinion that the learned trial court properly refused the peremptory instruction requested by defendant, and that the question whether defendant negligently violated a duty which it owed to plaintiff, as an invitee upon its premises, to keep its premises in a reasonably safe condition, by failing to provide a reasonably suf-ficient gate or guard in front of the elevator shaft or opening, so as to prevent plaintiff from falling therein, is properly one within the sphere and province of the jury for determination. [Bennett v. Railroad Co., 102 U. S. 577, 585, 26 L. Ed. (U. S.) 235.] Hence, said assignment of error must be ruled against appellant.

II. Appellant assigns error in the giving of certain instructions to the jury at the request, and on behalf, of plaintiff, and in the refusal of certain instructions requested by defendant. Appellant complains generally of the giving of Instructions P-2 and P-3 on behalf of plaintiff, and in the refusal of Instructions D-3, D-9, D-10, D-11 and D-13, requested by defendant. Inasmuch as appellant has not pointed out in its brief wherein the trial court erred in giving, or in refusing, respectively, the above-numbered instructions, we assume that appellant has abandoned its assignments of error as respects said instructions. Our examination of those instructions, unaided by brief or argument on the part of appellant, discloses no prejudicial or reversible error in the action of the trial court thereon.

However, appellant has insistently challenged the giving of In-struction P-1 on behalf of plaintiff, and we must give attention there-to in our opinion. Plaintiff's Instruction P-1 submitted to the jury plaintiff's theory of recovery, and reads as follows:

"The court instructs the jury that if you believe and find from the evidence that the elevator in question was maintained and controlled by the Chesapeake & Gulf Fisheries Company and that no gate or guard was provided for the outside dock or entrance to said elevator to be used when the elevator platform was absent from such dock or entrance and that no regular operator was in charge of said eleva-

tor but the same was moved or operated by various employees on or off such elevator platform; and if you further find that it was the custom of said defendant to move said elevator platform from the dock floor while the truck drivers engaged in hauling its goods were standing on said dock or on the rear end of their trucks and in close proximity to said entrance, adjusting or fastening their loads, and that such dock was usually in a slick and slippery condition and that there was danger of such persons slipping from said dock and falling into the elevator shaft when the elevator platform was moved from that entrance and that said defendant knew, or in the exercise of ordinary care could have known of such danger (if any), and that a gate or guard sufficient to prevent such persons from falling into said shaft was reasonably practicable in connection with the use of said elevator and that a reasonably prudent person in the position of the defendant, in the exercise of ordinary care and under the aforesaid conditions and circumstances, would have provided such a gate or guard for the protection of such persons, then it was the duty of the defendant Chesapeake & Gulf Fisheries Company to provide a reasonably sufficient gate or guard to prevent such persons from falling into such shaft and the failure to do so would constitute negligence; and if you further believe and find from the evidence that the foreman of the Midwest Fisheries Association sent the plaintiff to the plant of defendant Chesapeake & Gulf Fisheries Company with instructions to do such work as the foreman of said Chesapeake & Gulf Fisheries Company directed him to do and that in pursuance of such instructions plaintiff subjected himself to the direction and control of the foreman of the Chesapeake & Gulf Fisheries Company and that at the time of the plaintiff's injury (if any) he was working under the direction and control of the Chesapeake & Gulf Fisheries Company as a truck driver engaged in hauling its goods; and if you further find that the plaintiff was standing on said dock and on the tail gate of said truck adjusting the load on the truck and that without his knowledge (if you so find) the elevator platform was removed from said dock and entrance in the customary manner aforesaid (if you so find) and that plaintiff slipped and fell into said elevator shaft and was thereby injured; and if you further find from the evidence that his falling into said shaft was the direct result of the negligence aforesaid (if you find such negligence) and that at the time and place in question plaintiff was in the exercise of ordinary care for his own safety, then your verdict should be in favor of the plaintiff and against the defendant, Chesapeake & Gulf Fisheries Company."

It is urged that the instruction told the jury that it was the duty of defendant to provide and maintain a reasonably sufficient gate or guard to prevent persons from falling into the elevator shaft from

the loading dock, whereas the proof shows that the defendant had in fact provided a sliding door sufficient to guard the east opening of the elevator shaft. What we have said in Paragraph I of this opinion, respecting the habitual nonuser of such door for such purpose, under the uncontradicted evidence, sufficiently disposes of such criticism of the instruction.

It is furthermore urged by appellant that the instruction was confusing and misleading to the jury in that it required the jury to find that no regular operator was in charge of the elevator, and in that it also required the jury to find that the loading dock was usually in a slick and slippery condition, without also submitting the failure of defendant to employ or keep a regular operator in charge of the elevator and the use and maintenance of the loading dock in a slick and slippery condition as independent acts of negligence on the part of defendant; in other words, appellant insists that the instruction, in the two respects mentioned, required the jury to find the existence of facts which are not controverted by defendant, and which are wholly unnecessary and not essential to a recovery under plaintiff's theory of submission, namely, that defendant was negligent solely and singly in failing to provide and maintain a reasonably sufficient gate or guard at the east opening of the elevator shaft to prevent persons who might be using the loading dock from falling therein. Hence, appellant argues that the instruction was confusing and misleading to the jury in that it may have led the jury to infer and believe that defendant was negligent in not having a regular operator in charge of the elevator, and in permitting the use of the loading dock in its slippery, slick and slimy condition, both of which facts, or premises, are uncontroverted and admitted under the evidence. Respondent meets the criticism of appellant by answering that plaintiff is entitled to submit to the jury all of the surrounding facts, conditions and circumstances which gave rise to, and created, the existing dangerous situation, and, by reason of the existence of which surrounding facts, conditions and circumstances, the legal duty devolved upon defendant, in the exercise of ordinary care, to provide and maintain a reasonably sufficient gate or guard to prevent plaintiff from falling into the open elevator shaft; that each of such surrounding facts, conditions and circumstances does not necessarily, and in and of itself, constitute actionable negligence on the part of defendant, but that every and all of such facts, conditions and circumstances are to be found and taken into consideration by the jury in arriving at the ultimate determination whether, in view of the existence of the same and the dangerous situation thereby created, defendant was guilty of negligence in failing to provide and maintain

a reasonably sufficient gate or guard in front of the elevator doorway; and that the promiscuous and indifferent operation of the elevator by defendant's several employees, whether on or off the elevator platform, and the slick, slimy and slippery condition of the loading dock, are each and both constituent elements of the existing dangerous situation which gave rise to, and called forth, the correlative obligation and duty upon defendant's part to reasonably guard and protect the habitually open and unguarded doorway of the elevator shaft. We think that the answer of respondent to appellant's criticism is sound, logical and well-grounded. Ordinary care on the part of a defendant must be measured by the surrounding conditions and circumstances, and an instruction that enumerates the surrounding facts, circumstances and conditions, which, if found by the jury, create a dangerous situation, in view of such facts, circumstances and conditions, calling for the furnishing of a reasonably sufficient gate or guard, in the exercise of ordinary care, to prevent an invitee or licensee upon the premises from falling into an open and unguarded elevator shaft, is, in our opinion, neither prejudicial nor erroneous. [Oglesby v. Railway Co. (Mo. Sup.), 1 S. W. (2d) 172, 180; Bollinger v. Mfg. Co. (Mo. Sup.), 249 S. W. 907, 912; Kidd v. Railway Co., 310 Mo. 1, 41.] Besides, the jury were instructed, at defendant's request, "that you cannot find the defendant guilty of negligence by reason of the claim that defendant negligently allowed and permitted said dock, floor or platform to become coated or covered with slime, water and slick substances, and said charge of negligence is withdrawn from your consideration." Doubtless, had defendant likewise requested a similar instruction withdrawing from the consideration of the jury the charge or assignment that no regular operator was employed by defendant and placed in charge of the elevator as a separate, independent and distinct charge of negligence, the trial court would have so instructed the jury. However, such withdrawal instruction was not requested by defendant. We do not regard plaintiff's Instruction P-1 as misleading or confusing to the jury, or as conflicting with defendant's given instructions. Neither is the instruction prejudicial or erroneous because of its verbosity and length. [Kidd v. Railway Co., 310 Mo. 1, 40; Wolfe v. Payne, 294 Mo. 170, 187.]

Appellant assigns error in the refusal of its requested Instruction D-8, as follows:

"The court instructs the jury that you cannot find the defendant, Chesapeake & Gulf Fisheries Company, guilty of any negligence by reason of the claim that the defendants negligently failed to furnish plaintiff with a reasonably safe place to work, in that they failed to provide and operate an automatic gate at said time and place on the first floor of said building,

where said opening of said elevator shaft opened out onto said narrow dock or floor and into said alley in the rear of said building, and said charge of negligence is withdrawn from your consideration so far as the defendant, Chesapeake & Gulf Fisheries Company, is concerned.''

Appellant, in its printed brief, concedes that plaintiff submitted his case to the jury upon the sole and single theory that defendant was guilty of negligence at common law in not providing a reasonably sufficient gate or guard at the east elevator doorway, and that plaintiff therefore abandoned every and all other grounds or specifications of negligence alleged in the petition, which, of course, included the charge of negligence on the part of defendant in violating the ordinance of Kansas City pleaded in the petition and put in evidence by plaintiff. Regardless of the conceded fact that plaintiff did not submit his case upon the theory that defendant was guilty of actionable negligence in the violation of the aforesaid ordinance, appellant contends that nevertheless it was reversible error for the trial court to refuse defendant's withdrawal Instruction D-8 because the ordinance so pleaded and in evidence, among other matters, provided that ''a perpendicular *automatic* gate, where a freight elevator is used, shall be placed on each floor at which any hatch or opening may be;'' hence, the jury may have inferred that it was the duty of defendant, under the terms of said ordinance, to provide an *automatic* gate and that defendant was guilty of actionable negligence in failing to provide an *automatic* gate. None of the instructions given on behalf of plaintiff told the jury that, as a distinct and independent ground of recovery, it was negligence on defendant's part not to provide and maintain an *automatic* gate or guard, but that, in view of the surrounding circumstances and conditions, if found by the jury, the failure upon defendant's part to provide a *reasonably sufficient* gate or guard to prevent a person from falling into the open and unguarded elevator shaft would constitute negligence. Where, as here, plaintiff, upon the submission of his case, abandons all of the several independent and distinct assignments of negligence charged and alleged, save and except one, single assignment of negligence, upon which single assignment he is content to submit his case, the refusal of instructions withdrawing from the consideration of the jury one or more of the several abandoned assignments of negligence works no harm to the defendant, and does not constitute reversible error. [Dietzman v. Screw Co., 300 Mo. 196, 215; Schulz v. Smercina (Mo. Sup.), 1 S. W. (2d) 113, 119; Lewis v. Packing Co. (Mo. Sup.), 3 S. W. (2d) 244, 249; Reith v. Tober, 320 Mo. 725.]

1044

We find no reversible error in the giving or refusal of instructions, and said assignments must be ruled against appellant.

III. Appellant assigns error in the refusal of the trial court to discharge the jury, upon motion of defendant, because of certain questions asked by plaintiff's attorneys upon *voir dire* examination of the jury panel. The occurrence complained of by appellant is thus set out in the bill of exceptions:

"During a portion of the time that the members of the panel were examined on their *voir dire* the judge was out of the room. He was called into the room by Mr. Madden, one of plaintiff's attorneys, and then the lawyers gathered around the bench, out of the hearing of the jury, and informed the judge that certain matters had taken place in his absence—that Mr. Madden and Mr. Freeman (plaintiff's attorneys) had asked jurors certain questions, among them being the question inquiring of the jury whether any of the members of the panel were in any way connected with T. H. Mastin & Company (and I [the trial judge] find that such questions were asked by Mr. Freeman and Mr. Madden of the panel on their *voir dire*) and one of the jurors answered that he was so connected, or had been so connected, and in such a manner as that he would not like to try the case. Mr. Cope (defendant's attorney), representing the Chesapeake & Gulf Fisheries Company, stated that he did not represent the T. H. Mastin Company, and, at the request of Mr. Madden (plaintiff's attorney), I asked him what company he did represent, if any, and he said he represented the Casualty Reciprocal Exchange, or the Bruce Dodson Company all of which was out of the hearing of the jury, around the bench. At the request of Mr. Cope, I announced to the jury that T. H. Mastin & Company had no connection whatever with this matter. . . . Mr. Cope, on behalf of the Chesapeake & Gulf Fisheries Company, asked me to discharge the jury, which I denied. The questions asked the panel on their *voir dire* by Mr. Madden and Mr. Freeman (plaintiff's attorneys) as to the connection between any member of the panel and the T. H. Mastin Company were asked as above stated, and that was the principal ground on which I was asked to discharge the jury by Mr. Cope. I was not asked to discharge the jury by Mr. Cope on account of any claim by him that Mr. Madden had said in the hearing of the jury: 'I know there is some insurance company behind this defense and I am going to find out what company it is.' Nothing of that kind occurred."

The bill of exceptions recites no exception as having been taken and saved by appellant, at the time, to the action of the trial court in denying appellant's motion to discharge the jury. However, one

of the grounds specified in appellant's motion for new trial is that the trial court "erred in refusing to sustain defendant's motion to discharge the jury panel after prejudicial matter had been presented to them, in that there was an indemnity insurance company protecting the defendant," and that "the court permitted plaintiff to inject into the case the fact that an insurance company was behind, and was responsible for, the defendant and was the real party in interest." Exception was duly taken and saved to the overruling of defendant's motion for new trial.

The foregoing recital from the record discloses that, while counsel for plaintiff inquired of the jury panel, on *voir dire* examination, whether any of the jurors were in any way connected with T. H. Mastin & Company (which we will assume is an indemnity insurance corporation), it thereafter was developed, outside of the presence of the jury panel, that counsel for defendant was not representing T. H. Mastin & Company, but that he did represent (upon his own admission) another indemnity insurance corporation. Therefore, at the request of counsel for defendant-appellant, the trial court announced to the jury that T. H. Mastin & Company had no connection whatever with the case, and no further mention or reference to any insurance company was made in the presence of the jury by counsel for either party, plaintiff or defendant. In view of the admonition of the court to the jury, given at request of defendant-appellant, that T. H. Mastin & Company had no connection whatever with the case, and in further view of the fact that no reference or inquiry was again made of the jurors respecting any other indemnity insurance corporation, the natural and logical inference to be drawn from the record before us is that the jurors were left with the ultimate belief or impression that no indemnity insurance company (of whatever name) was interested in the defense of the case.

A similar situation arose in the case of Stegemann v. Heil Packing Co., 2 S. W. (2d) 169, 171, wherein plaintiff's counsel inquired of the jury, on *voir dire*, concerning their knowledge of, and connection with, a certain named insurance company, but thereafter plaintiff's counsel, in a statement to the court and jury, said that such question was asked by him under a misapprehension of the facts. In ruling that no prejudicial or reversible error was committed in denying the motion of defendant to discharge the jury because of such incident, DAUES, P. J., speaking for the St. Louis Court of Appeals, said: "The question, then, is whether we should, under this state of the record, reverse and remand this case on this ground. . . . Evidently it was discovered that the Employers' Liability Company had no connection with the suit. However, can we say that the course of justice was polluted or influenced by this incident? . . . In this case, the trial effect on the jury must have been that there was no in-

surance of any kind protecting defendant. Not only that, it brought a statement from plaintiff's counsel which would leave the impression on the jury that the reference to the insurance company was unwarranted and unjustified, which impression, we think, would give plaintiff's counsel no advantage as the trial proceeded. The course plaintiff's counsel took may indicate good faith, but the making of this interrogation without knowing the facts warrants strong disapproval of such conduct. However, when the whole situation is reviewed, we do not think that prejudicial error resulted from accepting the panel.''

Evidently counsel for plaintiff herein believed, or at least they so inferred, that the defense of the action was conducted by some indemnity insurance company (a fact which was thereafter openly admitted by defendant's counsel on interrogation by the trial court) and that the name of such insurance corporation was T. H. Mastin & Company; upon disclaimer of defendant's counsel that the named company had any connection with the defense of the case, the trial court, at request of defendant's counsel, admonished the jury panel that the named insurance company had no connection whatever with the case. Under such circumstances, and in the state of the record before us, we cannot say that plaintiff's counsel was acting in bad faith; on the other hand, the assumption may properly be indulged by us that plaintiff's counsel was acting in good faith. [Jablonowski v. Modern Cap Mfg. Co., 312 Mo. 173, 201.] Upon the record before us, no reversible or prejudicial error was committed by the trial court in overruling defendant's motion to discharge the jury panel, assuming (without deciding) that such question has been properly saved for review by the exceptions taken and saved to the action of the trial court in overruling defendant's motion for new trial. [Kinney v. Railway Co., 261 Mo. 97, 114; Wagner v. Construction Co. (Mo. Sup.), 220 S. W. 890, 897; Melican v. Construction Co. (Mo. Sup.), 278 S. W. 361, 366; Cazzell v. Schofield, 319 Mo. 1169.]

IV. Lastly, appellant insists that the verdict is so grossly excessive as to indicate passion and prejudice on the part of the jury. Without again reviewing the evidence as to the nature, extent and permanency of plaintiff's injuries, suffice it to say that, if the testimony of defendant's medical witnesses is to be believed, then plaintiff is either a base malingerer or a hopeless hypochondriac; on the other hand, if the testimony of plaintiff's medical witness is to be believed, plaintiff suffers from severe and permanent injuries, directly resulting from the unfortunate casualty, which incapacitate him from engaging in work of the kind

that he had theretofore performed, and which, at his youthful age, materially reduce his earning capacity. The jury and the experienced trial judge saw and heard plaintiff and his medical witnesses upon the witness-stand, and are better able to judge of the nature, extent and permanency of plaintiff's injuries, and of the credibility of the several witnesses, than is an appellate court, which has only the printed testimony before it. The learned and experienced trial judge apparently found no sufficient reason to reduce the amount of the verdict, which was the unanimous finding of the jury, although requested so to do in defendant's motion for new trial. This court has recently approved awards of damages in approximately like amount, where the injuries, in nature and extent, were quite similar to those from which plaintiff herein claims to suffer. [Unterlachner v. Wells, 296 S. W. 755, 763; Schroeder v. Wells, 298 S. W. 806, 811; Clark v. Railway Co., 300 S. W. 758, 764; Timmermann v. Iron Co., 1 S. W. (2d) 791, 798; Pulliam v. Wheelock, 3 S. W. (2d) 374.]

Having given careful consideration to each and all of appellant's several assignments and contentions, and finding no reversible error therein, we are of opinion that the judgment *nisi* must be affirmed, and it is so ordered. *Lindsay, C.,* concurs; *Ellison, C.,* not sitting.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.